**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASANTE<br>2650 Siskiyou Blvd. Ste 200<br>Medford, OR 97504<br><br>ASANTE ROGUE VALLEY MEDICAL<br>CENTER<br>2825 E Barnett Rd.<br>Medford, OR 97504<br><br>ASANTE THREE RIVERS MEDICAL CENTER<br>500 SW Ramsey Ave<br>Grants Pass, OR 97527<br><br>ASANTE ASHLAND COMMUNITY HOSPITAL<br>280 Maple St.<br>Ashland, OR 97520<br><br>RENOWN REGIONAL MEDICAL CENTER<br>1155 Mill St.<br>Reno, NV 89502<br><br>RENOWN SOUTH MEADOWS MEDICAL<br>CENTER<br>10101 Double R. Blvd.<br>Reno, NV 89521<br><br>SKY LAKES MEDICAL CENTER<br>2865 Daggett Ave.<br>Klamath Falls, OR 97601<br><br>YUMA REGIONAL MEDICAL CENTER<br>2400 S. Avenue A<br>Yuma, AZ 85364,<br><br>        *Plaintiffs*,<br>    v.<br><br>ALEX M. AZAR II, in his official capacity,<br>Secretary, Department of<br>Health and Human Services<br>U.S. Department of Health and Human<br>Services | Civil Action No. |

1

Hubert H. Humphrey Building
200 Independence Ave., SW
Washington, DC 20201

DEPARTMENT OF HEALTH AND HUMAN
SERVICES
Hubert H. Humphrey Building
200 Independence Ave., SW
Washington, DC 20201

SEEMA VERMA, in her official
capacity, Administrator, Centers for Medicare
and Medicaid Services
Hubert H. Humphrey Building
200 Independence Ave., SW
Washington, DC 20201

CENTERS FOR MEDICARE AND
MEDICAID SERVICES
Hubert H. Humphrey Building
200 Independence Ave., SW
Washington, DC 20201

*Defendants*.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs seek declaratory and injunctive relief against Defendants Alex M. Azar II, in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), HHS, Seema Verma, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services ("CMS"), and CMS, and for their causes of action state:

### INTRODUCTION

1.      Each year the California Department of Health Care Services ("Department"), pursuant to a state plan amendment ("SPA") approved by CMS, pays California hospitals over $4 billion in federal Medicaid Quality Assurance Fee ("QAF") subsidies.  The Department does not, however, pay federal Medicaid QAF subsidies to any "border hospital," which are hospitals in the United States that are 55 miles or less from the California border.  Like in-state hospitals,

these "border hospitals" also treat a significant number of California Medicaid ("Medi-Cal") patients.

2.      The Department has designated thirty-seven (37) hospitals in Oregon, Nevada, and Arizona as "border hospitals."  These "border hospitals" provide over seventy percent (70%) of the inpatient care that California Medi-Cal beneficiaries receive at out-of-state hospitals.

3.      Many of the services the "border hospitals" provide are indispensable, such as the trauma services provided by plaintiffs Renown Regional Medical Center and Rogue Valley Medical Center ("RVMC").  A trauma center is a hospital equipped to provide comprehensive emergency medical services to patients suffering traumatic injuries.

4.      Renown Regional Medical Center is in Reno, Nevada and is the only trauma center between Sacramento and Salt Lake City.  RVMC is in Medford, Oregon.  The nearest trauma centers to it are OHSU and Legacy Emanuel Medical Center in Portland, Oregon, both of which are 275 miles north of RVMC, and Mercy Medical Center in Redding, California, which is 150 miles south of RVMC.

5.      The acuity of Medi-Cal patients treated at out-of-state hospitals is more than twice the acuity of Medi-Cal patients who are admitted to in-state hospitals.  *Children's Hospital Medical Ctr. v. Belshe*, 97 Cal. App. 4th 740, 760 n.12 (Cal. Ct. App. 2002) states:

> The trial court found that the average DRG weight of Medi-Cal patients treated by respondent hospitals was "much higher" than that of the Medi-Cal patients treated by in-state hospitals with which DHS has contracts.  The court found, for example that the DRG weights of Medi-Cal patients treated at respondents Washoe Medical Center [now known as Renown Regional Medical Center] and Rogue Valley Medical Center are, respectively, 2.16 and 1.77, more than twice as high as the average DRG weight of contracting in-state hospitals, which is only .87.

Renown Regional Medical Center and Rogue Valley Medical Center, the two facilities named above, are plaintiffs in this lawsuit and treat thirty-eight percent (38%) of all Medi-Cal

beneficiaries who receive inpatient care at "border hospitals." Thus, "border hospitals" treat the sickest Medi-Cal patients who "require a greater expenditure of resources and costs, than the typical in-state Medi-Cal patient." *Children's Hospital Medical Ctr. v. Belshe*, 97 Cal. App. 4th 740, 760 (Cal. Ct. App. 2002).

6.     Even though the plaintiffs deliver the most expensive services to California Medi-Cal patients, and serve as an important safety net when providing essential trauma and other complex services, the Department excludes them from receiving any portion of the $4 billion in federal QAF subsidies that it distributes each year.  Plaintiffs contend that this violates the Commerce Clause (U.S. Const. art. I, § 8, cl. 3), the Equal Protection Clause (U.S. Const. amend. XIV, § 1), 42 U.S.C. § 1396a(a)(16), 42 C.F.R. § 431.52, the Administrative Procedure Act ("APA") (5 U.S.C. § 701 *et seq.*), and the Declaratory Judgment Act (28 U.S.C. § 2201).

## JURISDICTION AND VENUE

7.     The Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. § 706, because this action presents a case and controversy under the U.S. Constitution, the Medicaid Act, the APA, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

8.     Venue lies in this district under 28 U.S.C. § 1391 because the defendants reside in the District of Columbia and a substantial part of the events giving rise to this claim occurred in the District of Columbia.

## THE PARTIES

9.     All of the plaintiffs operate general acute care hospitals in Oregon, Nevada, and Arizona.  These hospitals have been deemed for Medicaid purposes to be "border hospitals," which means that they are located in the United States and are within fifty-five miles driving

distance from the nearest physical location at which a road crosses the California border. Plaintiff Asante is an Oregon not-for-profit corporation with its principal place of business in the State of Oregon, on behalf of plaintiffs "Rogue Valley Medical Center" in Medford, Oregon, "Three Rivers Community Hospital" in Grants Pass, Oregon, and "Ashland Community Hospital" in Ashland, Oregon. Renown Regional Medical Center is a Nevada not-for-profit corporation dba as "Renown Regional Medical Center" in Reno, Nevada. Renown South Meadows Medical Center is a Nevada not-for-profit corporation dba "Renown South Meadows Medical Center" in Reno, Nevada. Sky Lakes Medical Center, Inc. is an Oregon not-for-profit corporation dba "Sky Lakes Medical Center" in Klamath Falls, Oregon. Yuma Regional Medical Center is an Arizona not-for-profit corporation dba "Yuma Regional Medical Center" in Yuma, Arizona.

10. Defendant Alex M. Azar II is the United States Secretary of Health and Human Services. Defendant Azar, by and through his designees at CMS, undertook the illegal and unauthorized actions challenged in this case. Defendant Azar is sued solely in his official capacity.

11. Defendant HHS is the federal agency that oversees the operation of the Medicaid program.

12. Defendant Seema Verma is the Administrator of CMS. CMS is the agency that administers the Medicaid program. Defendant Verma is sued solely in her official capacity.

13. Defendant CMS is the federal agency to which Defendant Azar has delegated the authority pursuant to the Social Security Act, 42 U.S.C. §§ 1396a(13)(A)(iv), 1396r-4(a)(1)(B), to administer the Medicaid program.

## PREVIOUS QAF LAWSUITS AND DISPUTES

14.     On October 11, 2009, Governor Schwarzenegger signed Assembly Bill 1383 ("AB 1383") into law.  The primary purpose of AB 1383 was to obtain more federal Medicaid money.

15.     In response to that legislation, fifteen out-of-state hospitals filed two QAF lawsuits against the Department: *Asante v. Jolly*, No. 3:10-cv-01236-JSW, (N.D. Cal. June 23, 2010) (the "First QAF Lawsuit") and *Asante v. Maxwell-Jolly*, Case No. 3:10-cv-03828-CRB (N.D. Cal. August 27, 2010) (the "Second QAF Lawsuit").  The court documents pertaining to these QAF lawsuits are available on Pacer and are a matter of public record.

16.     On March 24, 2010, hospitals located in Nevada, Oregon, and Arizona filed the First QAF Lawsuit seeking to enjoin the application of AB 1383.  *Asante v. Jolly*, No. 3:10-cv-01236-JSW, (N.D. Cal. June 23, 2010).  On April 8, 2010, the plaintiffs in the First QAF Lawsuit filed a Motion for a Preliminary Injunction.  *Id*.  On June 24, 2010, after the matter had been fully briefed, this lawsuit was dismissed as not ripe because CMS had not yet approved California's QAF program.  *Id*.  Judge White's conclusion was based on "multiple provisions [in AB 1383] which provide that no part of the statute may be implemented until all federal approvals have been obtained."  *Id*. at ECF Document 40, 4:12-13.

17.     The State of California subsequently amended the provisions of AB 1383 to permit the distribution of federal monies without SPA approval.  AB 1653 states in pertinent part: "Notwithstanding any other provision of law, the director shall have discretion to modify any…timelines…if all federal approvals…are not secured…by September 1, 2010…The discretion to modify timelines under this section shall include, but not be limited to, discretion to accelerate payments to plans or hospitals."  Cal. Welf. & Inst. Code § 14167.353 (AB 1653, Sec. 24).

18.     As a result, on August 27, 2010 the out-of-state hospitals filed the Second QAF

Lawsuit, *Asante v. Maxwell-Jolly*, Case No. 3:10-cv-03828-CRB, ECF Doc. No. 1, and moved

for a Temporary Restraining Order and an Order to Show Cause for a Preliminary Injunction.  At

the hearing on these motions, the State agreed not to distribute any QAF monies without first

giving the Court and the plaintiff out-of-state hospitals 24 hours' notice.  The Court also set the

Preliminary Injunction hearing for September 21, 2010 and ordered the parties to appear at a

Mandatory Settlement Conference on September 17, 2010.

19.     At that Settlement Conference the out-of-state hospital plaintiffs, hereinafter

called the "QAF Hospitals," resolved their dispute with respect to AB 1383 and AB 1653 for the

period through and including December 31, 2010.  *Asante v. Maxwell-Jolly*, Case No. 3:10-cv-

03828-CRB, ECF Doc. No. 50 filed on 10/22/10.

20.     On April 13, 2011, the Medi-Cal Hospital Rate Stabilization Act of 2011 and the

Hospital Quality Assurance Fee Act of 2011 were signed into law, establishing a hospital QAF

program for the period from January 1, 2011 through June 30, 2011.  The QAF Hospitals have

resolved their dispute with respect to the above-cited laws for the period from January 1, 2011

through June 30, 2011.

21.     On September 16, 2011, SB 355 was signed into law.  SB 355 provided for a

hospital QAF program for the period from July 1, 2011, through December 31, 2013.  The QAF

Hospitals have resolved their dispute with respect to SB 355 for the period from July 1, 2011,

thru December 31, 2013.

22.     On October 8, 2013, SB 239 was signed into law.  As part of SB 239, the State

enacted the Medi-Cal Hospital Reimbursement Improvement and Restoration Act of 2013 (the

"Act"), codified at Cal. Welf. & Inst. Code §§ 14169.50 - 14169.76.  The first program period

under the Act was January 1, 2014, to December 31, 2016.  Cal. Welf. & Inst. Code § 14169.51.

The QAF Hospitals have resolved their dispute with respect to the Act for the period from

January 1, 2014, to December 31, 2016.

23.     On November 8, 2016, Proposition 52 was approved by the California voters, a

ballot initiative that extended indefinitely the QAF program under the Act.

24.     The second program period under the Act was January 1, 2017 through June 30,

2019.  The QAF Hospitals have resolved their dispute with respect to the Act for the period from

January 1, 2017 through June 30, 2019.

25.     On May 1, 2019, Lloyd Bookman, the attorney for the California Hospital

Association ("CHA"), an intervenor in the Second QAF Lawsuit, informed attorney Dean

Johnson (a lawyer for the plaintiffs in the earlier QAF lawsuits and this lawsuit) that CHA would

not resolve any QAF disputes for Medi-Cal services rendered after June 30, 2019.  Hence, in this

lawsuit the plaintiffs are challenging California's QAF payments for Medi-Cal services rendered

after June 30, 2019.

26.     In 2010, at the time that the initial QAF lawsuits were brought, the concept of a

California "border hospital" did not even exist.  As a result, the initial QAF lawsuits sought

supplemental QAF payments on behalf of some out-of-state hospitals that were located more

than 55 miles from a California border, and other out-of-state hospitals that were located within

55 miles of a California border.  This lawsuit is limited to out-of-state hospitals that are located

within 55 miles of a California border.

**FEDERAL MEDICAID LAW**

27.     Under the Spending Clause, Congress passed Title XIX of the Social Security

Act, 42 U.S.C. §§ 1396 *et seq*., the Medicaid Act, which authorizes federal financial support to

states for medical assistance to low-income persons.  The Medicaid program is jointly financed by the federal and state governments.

28.     Medicaid is voluntary, but once a state decides to participate in the Medicaid program compliance with the federal Medicaid laws and regulations is mandatory.  *Wilder v. VA Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  Every state, including the District of Columbia, participates in the Medicaid program.

29.     Once a State chooses to participate in the Medicaid program it must adopt a "State Plan," which is a comprehensive written statement that describes the nature and scope of the state's Medicaid program.  A State Plan must conform to the statutory requirements set forth in the Medicaid Act and its implementing regulations.  *Harris v. McRae*, 448 U.S. 297 (1980).  If a state wants to change its Medicaid plan once approved, such as for the adoption of a QAF program, it must obtain approval from the federal government to do so in the form of a State Plan Amendment ("SPA"), which the federal government again reviews for compliance with the Medicaid Act.  42 C.F.R. § 430.12(c).

30.     Congress expressly delegated to the Secretary of HHS the responsibility and the authority to administer the Medicaid program and to review state Medicaid plans and plan amendments for compliance with federal law.  42 U.S.C. § 1396a(b) ("The Secretary shall approve any plan which fulfills" the statutory requirements).  The Secretary, in turn, delegated that responsibility and authority to the administrator of CMS.  42 C.F.R. § 430.15(b); *see also Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 297 (3d Cir. 2013) ("States must submit their proposed plans to CMS, and CMS must review each plan, 'make a determination as to whether it conforms to the requirements for approval,' 42

U.S.C. § 1316(a)(1), and 'approve any plan which fulfills the conditions specified' in the Medicaid Act, 42 U.S.C. § 1396a(b).").

31.     "If the Secretary approves the state's Medicaid plan, the state's payments are considered to be expenditures made 'under' the state plan.  42 U.S.C. § 1396b(a)(1).  Expenditures made under the state plan, in turn, are matched by federal funds according to a percentage formula tied to the per-capita income in the state, with the percentage ranging from fifty percent to eighty-three percent of the cost of medical services provided under the plan.  42 U.S.C. §§ 1396b; 1396d(b)."  *Cove Associates Joint Venture v. Sebelius*, 848 F. Supp. 2d 13, 16-17 (D.D.C. 2012).  In other words, depending upon the state, the federal government pays between fifty percent and eighty-three percent of all Medicaid costs.

## CALIFORNIA PAYMENT SYSTEM FOR MEDI-CAL SERVICES RENDERED

32.     There are significant differences between California's reimbursement system for Medi-Cal services rendered and its supplemental payment programs, such as its QAF and disproportionate share ("DSH") programs.  We describe below how California pays hospitals for the Medi-Cal inpatient services they provide.  In later sections, we describe how California's supplemental payment programs work.

33.     California has elected to participate in the Medicaid Program and has named its program "Medi-Cal."  Cal. Welf. & Inst. Code §§ 14000 *et seq*.; Cal. Code Regs., tit. 22 ("22 C.C.R.") §§ 50000 *et seq*.  Medi-Cal is the largest payer for health care services in California, covering one-third, or 14 million, of the State's residents.

34.     Nearly 80% of the Medi-Cal beneficiaries receive their care through a managed care organization ("MCO").  In the managed care system, MCOs enter into agreements with the Department and receive a monthly capitated payment for a specified benefit package.  The

MCOs then pay the hospitals for the services they render.  To satisfy the federal and state

"network adequacy" requirements, MCOs enter into contracts with California hospitals.  These

contracting hospitals are referred to as "network" hospitals.  Medicaid beneficiaries are required

to seek medical treatment from "network" providers within their MCO's established network(s).

35.     In the fee-for-service system, which is the other payment model used in

California, the Department makes payments directly to hospitals for Medi-Cal services rendered.

These payments are based on All Patient Refined Diagnosis Related Groups ("APR-DRG"), a

concept that we explain below.

36.     With the approval of CMS, the State of California amended its Medicaid State

Plan as of July 1, 2015, to create a new category of hospitals called "border hospitals."  SPA 15-

020 defines this new term in the following manner: "'Border Hospitals' are hospitals located

outside the State of California that are within fifty five miles driving distance from the nearest

physical location at which a road crosses the California border as defined by the US Geological

Survey."

37.     The Department proposed SPA 15-020, and the concept of a new category of out-

of-state hospital called "border hospitals," in response to litigation that out-of-state hospitals

filed challenging the Department's design of a new inpatient reimbursement methodology based

on APR-DRGs.  *Asante v. California Department of Health Care Services*, Case 3:14-cv-03226-

EMC, (N.D. Cal.), Order at ECF Document 65 filed on 12/21/15.  We refer to this litigation as

the "APR-DRG Lawsuit."

38.     The APR-DRG Lawsuit was prompted by Senate Bill 853 (2010) which

authorized the Department to "design a new Medi-Cal inpatient hospital reimbursement

methodology based on diagnosis-related groups[.]"  Cal. Welf. & Inst. Code 14105.28(a).  On

July 1, 2013, the Department implemented its new Medi-Cal reimbursement methodology for many in-state hospitals and all out-of-state hospitals.

39.     Under the APR-DRG methodology, all hospital patients are categorized into APR-DRGs and then each APR-DRG is assigned a weight that reflects the typical hospital resources needed to care for that patient relative to the hospital resources needed to care for the average patient (who is assigned a APR-DRG weight of 1.0). Thus, a patient who consumes 5 times the hospital resources needed to care for an average patient would be assigned an APR-DRG of 5.0.

40.     In response to the APR-DRG Lawsuit, on June 19, 2015, the Department published notice that it was planning to submit a State Plan Amendment to CMS with proposed changes to the APR-DRG policies concerning the wage index, remote rural base price, NICU policy adjustment, and cost to charge ratio ("CCR") with respect to out-of-state "border hospitals."  The notice stated:

> It may be common practice for Medi-Cal recipients residing in some areas of California to obtain medical services in adjacent areas in the states of Oregon, Nevada and/or Arizona.  In recognition of the role that border hospitals may play in providing services to those Medi-Cal beneficiaries, the Department intends to submit a SPA to further align payment standards applicable to California hospitals and border hospitals to the greatest extent reasonably practicable.

25-Z Cal. Regulatory Notice Reg. (June 19, 2015).

41.     According to the declaration of Belinda Rowan, Chief of the Diagnosis Related Group (DRG) Section of the Safety Net Financing Division in the Department of Health Care Services, the proposed state plan amendment defined the new concept of "border hospitals" and provided for the following changes in the APR-DRG methodology that impact out-of-state "border hospitals":

> First, SPA 15-020 provides that the Department will apply the same wage index

policy for California hospitals and border hospitals.  This means that for both California hospitals and border hospitals, the wage index that the Department will use to adjust a hospital's base price will be the same hospital specific wage area index value that the Medicare program applies to the hospital, further adjusted by the California Wage Area Neutrality Adjustment of .9797.  Second, SPA 15-020 provides that the Department will apply the "remote rural" base price to border hospitals that are determined to be "rural" by the Medicare program, and that also meet the "remote" and non-combined licensed/provider number standards of the State Plan.  Third, SPA 15-020 provides that the cost-to-charge (CCR) ratio for determining outlier payments to border hospitals, will be based on the Medicare reported average CCRs for operating costs and capital costs for hospitals in the state in which a border hospital is located.  Fourth, SPA 15-020 provides that a border hospital will be added to the list of hospitals that get the 1.75 policy adjustment for neonate stays if and when it applies to the California Children's Services (CCS) program and is approved as either a regional neonatal intensive care unit (NICU) or community NICU that also meets CCS program neonatal surgery standards.

*Asante v. California Department of Health Care Services*, Case 3:14-cv-03226-EMC (N.D. Cal.), Rowan Decl. at ECF Document 59-1.  The above-described changes aligned the APR-DRG Medi-Cal payment rules for "border hospitals" with those applicable to California hospitals.

42.     On September 29, 2015, the Department obtained CMS approval of the above-described new State Plan Amendment 15-020.

43.     While the APR-DRG Lawsuit, and the subsequent adoption of SPA 15-020, significantly reduced the discrimination against out-of-state hospitals in the Department's APR-DRG payment methodology, it did nothing to correct the discrimination against out-of-state hospitals in the Department's QAF subsidy program.

## FEDERAL QAF PROGRAM

44.     In *Dana-Farber Cancer Inst. v. Burwell*, 216 F. Supp. 3d 49, 54 (D.D.C. 2016), the Court described the way in which hospitals were taking advantage of a "loophole" in the Medicaid program to gain extra matching funds from the federal government:

"In the late 1980s and early 1990s, states began to take advantage of a 'loophole' in the Medicaid program that allowed states to gain extra federal matching funds without spending more state money." *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006). "States desiring to avail themselves of this statutory loophole would make payments to hospitals and collect the federal matching funds." *Id*. "The state would then recoup a portion of the state funding from the hospital, often in the form of a 'tax.' " *Id*. (citation omitted).

45.     *Dana-Farber Cancer Inst. v. Burwell*, 216 F. Supp. 3d 49, 54 (D.D.C. 2016) also

described how the federal government dealt with this problem:

"Congress addressed this problem in the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102–234, 105 Stat. 1793 (1991) (codified at 42 U.S.C. § 1396b(w))." *Id*. "Through this legislation, Congress instructed the Secretary to reduce federal matching funds to a state by the amount of any revenue received from a health care related tax that 'hold[s] harmless' [,i.e., reimburses,] the health care provider upon whom the tax falls." *Id*. (quoting 42 U.S.C. § 1396b(w)(1)(A)(iii)). "States still may fund their share of Medicaid expenses by assessing taxes on health care related items, services or providers, as long as the tax is uniform, i.e., 'broad-based,' and the tax contains no 'hold harmless provision.' " *Id*. (quoting 42 U.S.C. § 1396b(w)(1)(A)(ii)(iii) & (4)).

46.     Thus, a state may impose a tax or fee, like California has done with its QAF

program, in order to generate state funds that can be matched with federal funds so that the state

receives additional federal Medicaid dollars.

## CALIFORNIA QAF PROGRAM

47.     The primary purpose of the California QAF program is to obtain more federal

money.  That purpose is explicitly articulated in the Act: "The Legislature continues to recognize

the essential role that hospitals play in serving the state's Medi-Cal beneficiaries.  To that end, it

has been, and remains, the intent of the Legislature to improve funding for hospitals and obtain

all available federal funds to make supplemental Medi-Cal payments to hospitals."  Cal. Welf. &

Inst. Code § 14169.50(a).

48.     The Department accomplishes this by collecting a quality assurance fee from certain types of California hospitals.  Private general acute care hospitals are required to pay the fee.  Cal. Welf. & Inst. Code § 14169.52(a).  However, public hospitals, small and rural hospitals, long-term care hospitals, and specialty hospitals (except for hospitals in the Charitable Research Hospital peer group) are exempt from the fee.  Cal. Welf. & Inst. Code § 14169.51(l).

49.     Hospitals that are not exempt pay a fee on essentially all inpatient days of care, excluding long-term care days and nursery days.  The QAF program imposes a four-part fee.  For managed care days (excluding Medi-Cal) in a health plan owned hospital the fee is $106.40/day.  For managed care days (excluding Medi-Cal) in a hospital that is not owned by a health plan the fee is $190.00/day.  For fee-for-service days (excluding Medi-Cal) the fee is $448.36.  For Medi-Cal days (both fee-for-service and managed care) the fee is $461.46.

50.     After the quality assurance fees are collected and augmented by federal matching funds they are distributed to California hospitals in various ways.

51.     The vast majority of the QAF money goes to "private hospitals."  Private hospitals are owned by private entities, which can be either not-for-profit or for-profit.  For the period from July 1, 2018 to June 30, 2019, the Department paid "private hospitals" in California $8,504,617,005 in QAF monies, which was eighty-seven percent (87%) of the total QAF money.  All the plaintiffs in this lawsuit are "private hospitals."  Despite this, the Department did not make additional QAF payments to any of these out-of-state "private hospitals."

52.     The Department accomplished this substantial transfer of QAF money through additional payments based on Medi-Cal days.  For the period from July 1, 2018 to June 30, 2019, "private hospitals" in California received additional amounts of $1,570.79/day for each Medi-Cal general acute care day and $975/day for each Medi-Cal acute psychiatric day.  In addition to

these amounts, qualifying "private hospitals" received an additional payment of $2,500 for their high acuity Medi-Cal days. "High acuity days" means "Medi-Cal coronary care unit days, pediatric intensive care unit days, intensive care unit days, neonatal intensive care unit days, and burn unit days." Cal. Welf. and Inst. Code § 14169.51(t). Also, the Department paid a supplement of $2,500.00 per Medi-Cal day to California hospitals designated as a trauma center (plaintiffs Renown Medical Center and RVMC are both trauma centers, but received no trauma money because they are located out-of-state) and to California hospitals that offer transplant services. No out-of-state hospital received any portion of these additional payments even though they also treat significant numbers of Medi-Cal patients, treat "high acuity" patients, and provide trauma services.

53.     For the period from July 1, 2018 to June 30, 2019, California made a lump sum QAF payment of $46,800,000 to the "non-designated public" hospitals in the State of California. There are forty-two "non-designated public" hospitals in the State of California. These consist of 41 district hospitals formed under California Health & Safety Code § 32000 *et seq*. and one municipal hospital. No out-of-state hospital received any portion of this lump-sum payment.

54.     For the period from July 1, 2018 to June 30, 2019, California made a lump sum QAF payment of $69,000,000 to the "designated public" hospitals in the State of California. There are twenty-one "designated public" hospitals in the State of California. Cal. Welf. & Inst. Code § 14166.1(d). These consist of hospitals operated by counties and the University of California. No out-of-state hospital received any portion of this lump-sum QAF payment.

55.     For the period from July 1, 2018 to June 30, 2019, California contributed $1,134,816,133 in QAF monies to the 13 children's hospitals in California. No out-of-state hospital received any portion of these QAF monies.

56.     For the period from July 1, 2018 to June 30, 2019, California contributed $2,000,000 in QAF monies to the Department to cover the administrative costs of the QAF program.

57.     In total, for the period from July 1, 2018 to June 30, 2019, California collected quality assurance fees of $3,893,816,449 and made QAF payments to California hospitals of $8,620,417,005.  The difference between these two amounts, which is $4,726,600,556, is the additional federal monies California received due to the existence of the QAF program.  No out-of-state hospital received any portion of these additional federal QAF monies.

## DSH AND QAF PROGRAMS

58.     The DSH and QAF programs are alike in several significant respects.  First, they both make supplemental payments to hospitals.  With respect to DSH, the California Court of Appeal states:

> We agree with the Court of Appeals of Texas that DSH funds "do not constitute payment for medical services rendered; they offer `additional reimbursement' based solely on the volume of services provided to indigent patients…In short, [the hospital] had no more than an expectancy of receiving additional reimbursement; any rights it had to [DHS] funds were contingent on a comparison of [the hospital's] level of services to indigent patients with that of other hospitals." (*S.C. San Antonio v. Dept. of Human Serv.* (1995 Tex. Ct. App.) 891 S.W.2d 773, 778.)  Just as Texas law characterizes DSH payments as "additional reimbursement" (*id*. at p. 778, citing 25 Tex. Admin. Code § 29.609), California law describes DSH payments as "payment adjustments" or "additional reimbursement" distributed as a "supplement" to payments for Medi-Cal services. (§ 14105.98, subds. (a)(3), (b), (d)(1); Stats. 1991, ch. 279, § 1(f), p. 1763; Cal. Code Regs., tit. 22, § 51539, subd. (c).)  Thus, although "payment adjustments" are amounts paid for hospital services provided by a DSH (§ 14105.98, subd. (a)(5)), "the payment adjustment amounts under this section shall be distributed as a supplement to" payments for Medi-Cal services. (§ 14105.98, subd. (d)(1).)

*Santa Ana Hospital Medical Center v. Belshé*, 56 Cal. App. 4th 819, 836 (Cal. Ct. App. 1997).

With respect to QAF, Cal. Welf. and Inst. Code § 14169.55 (underlining added) states:

> Private hospitals shall be paid <u>supplemental amounts</u> for the provision of hospital inpatient services for each subject fiscal quarter in a program period as set forth in this section.  The <u>supplemental amounts</u> shall be in addition to any other amounts payable to hospitals with respect to those services and shall not affect any other payments to hospitals.

Cal. Welf. and Inst. Code § 14169.55 repeatedly refers to the QAF payments as "supplemental amounts," and also declares that these "supplemental amounts shall be in addition to any other amounts payable to hospitals with respect to those services and <u>shall not affect any other payments to hospitals</u>."  (underlining added).  Cal. Welf. & Inst. Code § 14169.60 (underlining added) states: "(b) The supplemental payments and other payments under this article shall be regarded as quality assurance payments, the implementation or suspension of which <u>does not affect a determination of the adequacy of any rates under federal law</u>."  Also, Cal. Welf. & Inst. Code § 14169.52(k) (underlining added) states: "This subdivision creates a contractually enforceable promise on behalf of the state to…<u>maintain and continue prior reimbursement levels</u> as set forth in Section 14169.68 on the effective date of that section.  The foregoing statutes mean that the amounts paid under the QAF program are completely independent from the APR-DRG payments hospitals receive from the Department for the Medi-Cal services they provide.  *See also* Cal. Welf. and Inst. Code §§ 14169.50(a), 14169.54.

59.     Second, the DSH and QAF programs are both based on the technique of using hospital dollars to obtain federal matching funds, and then returning the hospital dollars along with the federal monies to the hospitals.  For the QAF program, the matching funds is obtained through fees.  In the case of DSH, these matching funds are obtained through intergovernmental transfers (IGTs).  *Santa Ana Hospital Medical Center v. Belshé*, 56 Cal. App. 4th 819 (Cal. Ct. App. 1997) states:

> The DSH Supplemental Payment Adjustment Program is a federally mandated program…In California, this program is administered by [the Department] on a

state fiscal year basis. The total program dollars available for each federal fiscal year is capped at $2.19 billion. These funds represent 50% federal dollars and 50% intergovernmental transfers (from counties, hospital districts and the University of California Regents). The DSH program has no state funding.

*Id.* at 826.

60.     Third, neither the DSH program nor the QAF program have any state funding. With respect to DSH, *Santa Ana Hospital Medical Center v. Belshé*, 56 Cal. App. 4th 819 (Cal. Ct. App. 1997) states: "The DSH program has no state funding." With respect to QAF, Cal. Welf. & Inst. Code § 14169.72 states that the QAF program "shall become inoperative" if there is "[a] net General Fund cost incurred due to the act."

61.     Given these significant similarities, one would expect that out-of-state hospitals would be treated the same under both programs. But, that is not the case. As we have already noted, out-of-state hospitals receive no QAF monies. On the other hand, it is well-established that out-of-state hospitals are entitled to DSH monies.

62.     Federal Medicaid regulations explicitly contemplate that states will make DSH payments to out-of-state hospitals. Section 1001(d) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173, enacted on December 8, 2003) added Section 1923(j) to the Medicaid Act. 42 U.S.C. § 1396r–4(j). It requires states to report additional information about their DSH programs to the Secretary of HHS. It also requires states to have their DSH payment programs independently audited and to submit the independently certified audit annually to the Secretary. To implement these reporting requirements, HHS added a new paragraph (c) to the reporting requirements at 42 C.F.R. 447.299. Subsection (18) of that new paragraph states: "States must report DSH payments made to all hospitals under the authority of the approved Medicaid State plan. This includes both in-State and out-of-State hospitals." 42 C.F.R. 447.299(c)(18) (underlining added).

63.     According to the annual DSH reports states are legally obligated to submit to the Secretary of HHS, the following states have made DSH payments to out-of-state hospitals: Arizona, Iowa, Kansas, Minnesota, Oregon, South Carolina, Virginia, Washington, and Wisconsin.  Also, there may be other states that would have paid DSH to out-of-state hospitals, but did not do so because no out-of-state hospital qualified for these funds.

64.     With respect to California, the Ninth Circuit has explained that the DSH "language does not say that only hospitals within the state can qualify for DSH payments; instead, it uses in-state hospitals to calculate a benchmark for the number of Medicaid patients serviced to determine whether a hospital (in-state or out-of-state) qualifies for DSH payments." *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096-97 (9th Cir. 1999).  Also, in *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 759 (2002), the California Court of Appeal held that California's DSH scheme violated the Commerce Clause because, among other factors, it annually distributes over $2 billion in disproportionate share adjustments to in-state hospitals, but has never made a payment of disproportionate share moneys to any out-of-state hospital.

65.     Many other courts have held that out-of-state hospitals are legally entitled to DSH payments: *Children's Seashore House v. Waldman*, 197 F.3d 654, 661-62 (3d Cir. 1999) (holding that the denial of Medicaid DSH payments to out-of-state hospitals may violate the Equal Protection Clause); *Mary Hitchcock Mem'l Hosp. v. Cohen*, Civil No. 15-cv-453-LM, (D.N.H. 2016) (denying defendants' motion to dismiss plaintiff's claims for DSH and teaching hospital payments); *W. Va. Univ. Hosps., Inc. v. Rendell*, 2007 U.S. Dist. LEXIS 81901, 1-2 (D. Pa. 2007) (holding that West Virginia University Hospitals, Inc. was entitled to trauma disproportionate share hospital payments); *Multicare Medical Center v. Washington*, 768

F.Supp. 1349, 1401 (W.D. Wash. 1991) (holding that the State of Washington must make DSH payments to out-of-state border hospitals that serve Washington's Medicaid recipients).

66.     The significant similarities between the DSH and QAF programs, and the fact that courts have held that states are legally required to make supplemental DSH payments to out-of-state hospitals, often on the same Commerce Clause or Equal Protection grounds as those alleged in this Complaint, strongly suggest that states should similarly make supplemental QAF payments to out-of-state hospitals.

### CALIFORNIA'S QAF PROGRAM DISCRIMINATES AGAINST OUT-OF-STATE HOSPITALS

67.     Under the Commerce Clause, "[a] statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Eastern Kentucky Resources v. Fiscal Court*, 127 F.3d 532, 540 (6th Cir. 1997).  The California QAF program discriminates against out-of-state hospitals in all three ways.

68.     Except for Alaska, every state and the District of Columbia has a provider tax. All these programs raise money in essentially the same way by imposing a tax/fee on providers which is then matched with federal dollars.  The states then distribute the resulting dollars in different ways.  Some of these distribution methods discriminate against out-of-state hospitals, while others do not.

69.     The fundamental flaw in California's QAF program is that it subsidies California hospitals at the expense of out-of-state hospitals, even though they both treat Medi-Cal patients. There are, however, distribution techniques that California could use that would not discriminate against out-of-state hospitals.

70.     For example, some states use taxes/fees to expand Medicaid coverage: "Eight of the Medicaid expansion states (Arkansas, Arizona, Colorado, Illinois, Indiana, Louisiana, New

21

Hampshire and Ohio) reported plans to use provider taxes or fees to fund all or part of the costs of the ACA Medicaid expansion beginning in January 2017, when states must pay five percent of the costs of the expansion."  Health Provider and Industry State Taxes and Fees, National Conference of State Legislatures, October 10, 2017, http://www.ncsl.org/research/health/health-provider-and-industry-state-taxes-and-fees.aspx.  While other states use provider tax money to increase overall reimbursement levels: "In a majority of cases, the cost of the tax is paid back to providers through an increase in the Medicaid reimbursement rate for their patient treatment and services."  *Id*.  Both of these broad-based distribution programs would not discriminate against out-of-state hospitals because all hospitals, both in-state and out-of-state, would benefit equally from them.  Thus, there are distribution techniques that California could use that would not discriminate against out-of-state hospitals.  But, California did not use any of these non-discriminatory distribution techniques.  Instead, it implemented a system of direct subsidies to in-state hospitals only, thereby totally excluding out-of-state hospitals from receiving the benefits of any federal QAF monies.

71.    As noted previously, there have been numerous disputes between out-of-state hospitals and the Department.  In an attempt to usurp the legitimate claims of out-of-state hospitals to their fair share of the federal QAF monies, in 2013 California adopted Cal. Welf. & Inst. Code § 14169.83.  This statute permits out-of-state hospitals to "opt-in" to a system of quality assurance fees and supplemental payments that allows out-of-state hospitals to be treated "in the same manner that the hospital could participate if it were located in the state."  While this statute may appear to resolve the legal issues raised by the out-of-state hospitals, upon closer examination it is both "purposefully" and "in practical effect" discriminatory.  This is because

under California law the QAF fee is primarily based on "total patient days," while the QAF

supplemental payment is primarily based on "Medi-Cal days."

72.     For similarly sized facilities, out-of-state hospitals would have roughly the same

number of total patient days as in-state hospitals, and thus would pay roughly the same QAF fee

as in-state hospitals.  But due to their physical location in other states, out-of-state hospitals

would not have as many Medi-Cal days as in-state hospitals, and thus would inevitably receive

QAF payments that are much lower than those received by in-state hospitals.  This means, in

effect, that out-of-state hospitals will always on average be "net losers" under the California

QAF program, while in-state hospitals will always on average be "net winners" under the

California QAF program.

73.     Anne Mcleod, who is a Vice President at CHA, discussed this approach in her

declarations in the prior QAF litigation.  In those declarations she concluded that Renown

Regional Medical Center and Rogue Valley Medical Center, two of the plaintiffs in this litigation

that provide 38% of the inpatient Medi-Cal services provided by all "border hospitals," would

incur significant losses if the QAF approach that is used for in-state hospitals is applied to out-of-

state hospitals.  With respect to Renown Regional Medical Center, she states:

> I anticipate that the maximum that Renown Regional could be paid pursuant to
> AB 1383/1653 for the period of April 1, 2009, to December 31 ,2010, is
> approximately $2,463,529…However, based on Renown Regional's Medicare
> cost report data, I estimate that Renown Regional would owe the State of
> California approximately $14.2 to $55 million in fees under the QAF program,
> many times more than what it would purportedly receive in supplemental
> payments.

*Asante v. Jolly*, Case 3:10-cv-03828-CRB (N.D. Cal.), McLeod Decl. at ECF Document 33.

As to Rogue Valley Medical Center, she states:

> I anticipate that the maximum that Rogue Valley could be paid pursuant to AB 1383/1653 for the period of April 1, 2009, to December 31, 2010, is approximately $952,684…However, based on Rogue Valley's Medicare cost report data, I estimate that Rogue Valley would owe the State of California approximately $6.9 to $23.5 million in fees under the QAF program, many times more than what it would purportedly receive in supplemental payments.

*Id*. at 26:13-20.  She concludes with the following summary:

> Based on these calculations, I estimate that the greatest amount that plaintiff hospitals could be paid if they were included in the AB 1383 methodology as they allege would be $4,044,318, excluding any fee.  If they were truly subject to AB 1383, however, they would pay approximately $124 million to $386 million in fees.  Altogether, I project that if the Plaintiffs were subject to both the fee and supplemental payment provisions of AB 1383, <u>they would net an approximate loss of $120 to $382 million</u>.

*Id*. at 28:7-13 (underlining added).

74.    The Department has never implemented Cal. Welf. & Inst. Code § 14169.83 because no rational decision-maker at an out-of-state hospital would ever "opt-in" to a QAF program that resulted in financial losses which CHA says will be $120 to $382 million per year. The choice between owing the State of California hundreds of millions of dollars in QAF fees, or receiving nothing, is no real choice at all.

75.    For the one-year period from July 1, 2018 to June 30, 2019, the net QAF benefit to California hospitals was $4,726,600,556 based on 2,814,141 Medi-Cal days.  Thus, in-state "private hospitals" received an average of $1,680 per Medi-Cal day in QAF subsidies. California did not distribute these federal QAF subsidies to any out-of-state "private hospital."

76.    For the effects of the QAF program to be non-discriminatory the plaintiff "border hospitals" (all of which are "private hospitals") should receive the same average net benefit as in-state "private hospitals."  This means that the plaintiffs should receive $1,680 per Medi-Cal day in QAF subsidies.  Applying this per day rate to the Medi-Cal days at the plaintiff "border hospitals" will produce the following QAF subsidies on a per year basis:

| Hospital Name | Estimated Medi-Cal Days Per Year | QAF Subsidy Per Medi-Cal Day | Total Annual QAF Subsidy |
|---|---|---|---|
| Renown (two hospitals) | 5,742 | $1,680 | $9,646,560 |
| Asante (three hospitals) | 1,956 | $1,680 | $3,286,080 |
| Yuma Regional Medical Center | 583 | $1,680 | $979,440 |
| Sky Lakes Medical Center | 435 | $1,680 | $730,800 |
| | 8,716 | | $14,642,880 |

77.     There is no requirement that a hospital that receives a QAF subsidy must also pay a QAF fee.  For example, none of the forty-two "non-designated public" hospitals in the State of California pay a QAF fee.  Yet, for the period from July 1, 2018 to June 30, 2019 these hospitals received $46,800,000 in federal QAF subsidies.  The twenty-one "designated public hospitals" in California are also exempt from QAF fees.  Yet, for this same period of time these hospitals received $69,000,000 in federal QAF subsidies.  Bob Sands, Chief of the Safety Net Financing Division in the Department, stated in his declaration in the prior QAF litigation that "238 hospitals will be subject to the QAF, and 322 hospitals will receive supplemental payments." *Asante v. David Maxwell-Jolly*, Case No. 3:10-cv-01236-JSW (N.D. Cal.), Decl. Bob Sands, ECF Doc. No. 31 at 5:1-2.  This means that 84 hospitals in California pay no quality assurance fee, but still receive a federal QAF subsidy.

78.     California could easily implement a similar program for out-of-state hospitals, thereby remedying the discrimination against out-of-state hospitals inherent in its QAF program.  By this we mean that it could make QAF payments to the thirty-seven "border hospitals" at the rate of $1,680 per Medi-Cal day (which is the average net QAF benefit in-state "private hospitals" receive), while also exempting these "border hospitals" from QAF fees.

79.     On July 1, 2017, the Department changed the methodology it used to distribute QAF monies for Medi-Cal managed care patients.  At that time, it began to pay a fixed daily add-on payment to California "network" hospitals.  The Department refers to this new system as its "directed payments" program.  To participate in the "directed payments" program a hospital must meet two requirements.  First, it must be a licensed hospital under Cal. Welf. & Inst. Code § 14169.51 and the section that it refers to, Cal. Health & Safety Code § 1250.  This means that it must be located in the State of California.  Second, it must be a "network" provider, which means that it must have entered into a contract with a California managed care organization ("MCO").

80.     California's "directed payment" program is facially invalid because it is limited to hospitals licensed under Cal. Welf. & Inst. Code § 14169.51 and Cal. Health & Safety Code § 1250.  This restriction effectively bars out-of-state hospitals from obtaining any federal QAF monies under the Department's "directed payment" program.

81.      Also, California's "direct payment" program limits the distribution of federal QAF monies to "network" hospitals — which are hospitals that have entered into contracts with a California MCO.  This requirement is "purposefully" and "in practical effect" invalid.

82.     As we explained earlier, an MCO must enter into an agreement with the state in which the MCO agrees to comply with all rules and regulations governing the Medicaid program, including the federal laws and regulations relating to "network adequacy."  Once this happens Medicaid beneficiaries are required to seek medical treatment from approved providers within their MCO's established network(s).  42 U.S.C. § 1396u-2.

83.     Each MCO has a "service area" which consists of one or more California counties.  Federal law mandates that each MCO "demonstrates that it has the capacity to serve

the expected enrollment in its service area in accordance with the State's standards for access to care under this part, including the standards at § 438.68 and § 438.206(c)(1)." 42 C.F.R. § 438.207.

84.     Implementing this federal requirement, California's has adopted "network adequacy" requirements.  These vary depending upon provider type.  For example, for "specialty care" there is a time and distance requirement based on county population density.  For rural counties, "specialty care" must be available within 60 miles or 90 minutes from the beneficiary's residence, for small counties 45 miles or 75 minutes from the beneficiary's residence, for medium counties 30 miles or 60 minutes from the beneficiary's residence, and for large counties 15 miles or 30 minutes from the beneficiary's residence.

85.     MCOs satisfy the "network adequacy" requirements by entering into contracts with providers.  In the case of hospitals, the California "network adequacy" requirement states that a hospital must be available within "15 miles or 30 minutes from [a] beneficiary's residence."  For example, in San Francisco County an MCO would be obligated to enter into contracts with enough hospitals to ensure that each MCO beneficiary in San Francisco County was within 15 miles or 30 minutes of at least one general acute care hospital.  In some counties (including San Francisco) there is more than one MCO, which means that a general acute care hospital in that county could have a contract with more than one MCO.

86.     The "network" requirement in the "directed payment" program is inherently discriminatory because out-of-state hospitals are not physically located in the service areas (aka counties) where the MCOs are located.  This means that California MCOs are under no obligation under the federal and state "network adequacy" requirements to enter into contracts with out-of-state hospitals.  On the other hand, so that they can meet the California requirement

that there be at least one "network" hospital within "15 miles or 30 minutes from [a] beneficiary's residence," California MCOs are obligated to enter into contracts with California hospitals. As a result, it is extremely unlikely that an MCO would enter into a contract for "network" services with an out-of-state hospital, but very likely that a California MCO would enter into a contract for "network" services with one or more California hospitals. That is reason the "network" requirement in the Department's "directed payment" program discriminates against out-of-state hospitals vis-à-vis in-state hospitals.

87.    Another provision of law that California adopted in an attempt to evade the legitimate claims of out-of-state hospitals to their fair share of the federal QAF monies is Cal. Welf. & Inst. Code § 14169.72. This statute states in pertinent part as follows:

> This article [i.e., the QAF program] shall become inoperative if any of the following occurs:
>
> (a) The effective date of a final judicial determination made by any court of appellate jurisdiction or a final determination by the United States Department of Health and Human Services or the federal Centers for Medicare and Medicaid Services that the quality assurance fee established pursuant to this article, or Section 14169.54 or 14169.55, cannot be implemented. <u>This subdivision shall not apply to any final judicial determination made by any court of appellate jurisdiction in a case brought by hospitals located outside the state</u>.

Cal. Welf. & Inst. Code § 14169.72 (underlining added).

88.    The foregoing statute states that if an appellate court declares that California's QAF program "cannot be implemented…in a case brought by hospitals located outside the state" that this judicial determination "shall not apply," but if an appellate court makes that declaration in a case brought by any other type of entity (such as a California hospital) that the judicial determination will be valid and enforceable. This statute is facially discriminatory under the Commerce Clause, it violates the separation of powers doctrine, and it is unenforceable under

various other constitutional provisions. *See generally* Cal. Const., art. III, § 3 and *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

### CMS APPROVALS AND PENDING SPAS

89.     With respect to the latest QAF program period, which was January 1, 2017 through June 30, 2019, the Department requested in its "California Amended Request for Waiver for Hospital Fee - Phase 5" dated December 11, 2017, that out-of-state hospitals be completely excluded from both the QAF fee and the QAF payments; in other words, from the entire California QAF Program.  The Department's letter states in pertinent part:

> The terms of the Phase 5 fee for which the waiver is sought are as follows:
>
> (i) Public hospitals are excluded from the fee;
> (ii) Small and rural hospitals are excluded from the fee;
> (iii) Psychiatric and specialty hospitals are excluded from the fee;
> (iv) <u>Out of State Hospitals are excluded from the fee and payments</u>;
> (v) New hospitals are excluded from the fee and payments…

Letter dated December 11, 2017 from the California Department of Health Care Services to Ms. Kristin Fan, Director Financial Management Group, U.S. Department of Health & Human Services (underlining added).

90.     In a letter dated December 14, 2017, CMS stated that it was approving the Department's request.  CMS's letter then described the items for which a waiver was sought, and the exact items that CMS had approved.  The ONLY item CMS does not mention in its approval letter is the Department's request that "Out of State Hospitals are excluded from the fee and payments."  This omission appears to be intentional because the Department requested a total of 10 waivers, and three different times (for three different time periods) CMS's letter responds to

only 9 waiver requests, each time never mentioning the Department's waiver request relating to out-of-state hospitals.

91.     The Department and CMS sent essentially identical letters to each other for the prior QAF program period, which was January 1, 2014, through December 31, 2016.  The Department's letter, which was entitled "California Request for Waiver for Hospital Fee - Phase 4," was dated November 21, 2014, and requested, like its later letter, that out-of-state hospitals be completely excluded from both the QAF fee and the QAF payments.  It stated:

> The terms of the Phase 4 fee for which the waiver is sought are as follows:
>
> (i) Public hospitals are excluded from the fee;
> (ii) Small and rural hospitals are excluded from the fee;
> (iii) Psychiatric and specialty hospitals are excluded from the fee;
> (iv) <u>Out of State Hospitals are excluded from the fee and payments</u>;
> (v) New hospitals are excluded from the fee and payments…

Letter dated November 21, 2014, from the California Department of Health Care Services to Mr. Timothy Hill, Director Financial Management Group, U.S. Department of Health & Human Services (underlining added).

92.     By letter dated January 14, 2015, CMS stated that it was approving the Department's request.  CMS's letter then details the items for which a waiver was sought, and the precise items that CMS had approved.  Again, the ONLY item CMS does not mention in its approval letter is the Department's request that "Out of State Hospitals are excluded from the fee and payments."  This omission also appears to be deliberate because in this letter the Department requested a total of 10 waivers, and four different times (for four different time periods) CMS's letter responds to only 9 waiver requests, and never mentions the Department's waiver request relating to out-of-state hospitals.

30

93.     The above-described letters are ambiguous as to whether out-of-state hospitals are in or out of California's QAF program.  California's actions, however, which must comply with the California Medicaid State Plan and be approved by CMS, are not ambiguous.  From its inception in 2009, California has excluded out-of-state hospitals from its QAF program.

94.     CMS's approval letters concerning the Department's "directed payment" program are not unclear.  The Department requested CMS approval of its "directed payment" program for the period from July 1, 2017 through June 30, 2018.  By letter dated March 6, 2018, CMS approved California's "directed payment" program for the period from July 1, 2017 through June 30, 2018.  CMS's letter states in pertinent part (underlining added): "Specifically, the following proposal for delivery system and provider payment initiatives is approved: Uniform Dollar Increase per adjudicated claim for private hospitals as defined in CA Welfare & Institutions Code § 14169.51 for the rating period covering July 1, 2017 through June 30, 2018."

95.     Also, the Department requested CMS approval of its "directed payment" program for the period from July 1, 2018 through June 30, 2019.  By letter dated December 17, 2018, CMS approved California's "directed payment" program for the period from July 1, 2018 through June 30, 2019.  CMS's letter states in pertinent part (underlining added): "Specifically, the following proposal for delivery system and provider payment initiatives is approved: Uniform Dollar Increase per adjudicated claim for private hospitals as defined in CA Welfare & Institutions Code § 14169.51 for the rating period covering July 1, 2017 through June 30, 2018."

96.     CMS's approval letters relating to "directed payments" effectively bar the distribution of federal QAF monies to out-of-state hospitals because no hospital that is physically located in a state other than California is or could be licensed under Cal. Welf. & Inst. Code § 14169.51.

31

97.     On or about June 28, 2019, the Department submitted another request to CMS for approval of its "directed payment" program.  This letter requested CMS's approval of the "directed payment" program for the current program period from July 1, 2019 through December 31, 2020.  If approved for the current program period, this "pending" request would continue to bar the distribution of federal QAF monies to out-of-state hospitals.

98.     In addition to the above-described "directed payment" letter for the current program period from July 1, 2019 through December 31, 2020, the following QAF SPAs are also now "pending" before CMS: SPA 18-012 (proposes to correct an inconsistency discovered with the language in the approved SPA 17-004 as compared to language in controlling state statute at Welfare & Institutions (W&I) Code section 14169.55(b)(6)); SPA 18-0043 (proposes to allow supplemental reimbursement to hospitals up to the aggregate upper payment limit without supplanting specified existing levels of payments for the provision of inpatient services to Medi-Cal beneficiaries); SPA 18-0044 (proposes to allow supplemental reimbursement to hospitals up to the aggregate upper payment limit without supplanting specified existing levels of payments for the provision of outpatient services to Medi-Cal beneficiaries); and, the March 30, 2017, SPA letter from the Department to CMS entitled California Request for Waiver for Hospital Fee - Phase 5.

99.     Also, the following QAF SPAs have been "proposed" by the Department.  This means that the Department has published notice of them in California, but has not yet submitted them to CMS: 19-0018 (proposes to provide supplemental payments to eligible hospitals in the Hospital Quality Assurance Fee (HQAF) program up to the federal upper payment limit); 19-0019 (proposes to provide supplemental payments to eligible hospitals in the HQAF program up to the federal upper payment limit), 19-0023 (proposes to extend the supplemental

reimbursement for Qualified Private Hospitals Program to June 30, 2020); 19-0024 (proposes to extend the supplemental reimbursement for Qualified Non-Designated Public Hospitals program to June 30, 2020); and, 19-0035 (proposes to provide one-time supplemental payment for eligible providers that received FFS payments in the HQAF program for private hospital inpatient subacute services).

100.    Under federal law, the effective date of a SPA may be no "earlier than the first day of the quarter in which" the amendment is submitted for federal approval.  42 C.F.R. 430.20(a)(1) and (b)(2).  This means that California must submit the above-described "proposed" QAF SPAs by no later than September 31, 2019, for them to take effect beginning on July 1, 2019.

101.    Cal. Welf. & Inst. Code  § 14169.63 provides in pertinent part that "the department may impose and collect the quality assurance fee and may make payments under this article, including increased capitation payments, based upon receiving a letter from the federal Centers for Medicare and Medicaid Services or the United States Department of Health and Human Services that indicates likely federal approval[.]".  Thus, California law permits the Department to operate its QAF program, and thereby permanently deprive the plaintiff "border hospitals" of the federal QAF subsidies they are entitled to receive, before federal approval of a SPA.

102.    None of the above-described "pending" or "proposed" SPAs include any provision for the payment of federal QAF money to the plaintiff "border hospitals."

103.    Based on the foregoing, an actual and justiciable controversy exists regarding whether out-of-state hospitals are entitled a portion of the federal QAF money that California distributes each year.  Furthermore, each of the plaintiffs has a right and an enforceable interest

to maintain this action to require the defendants to comply with their obligations under the law and to discharge those duties in a manner that is not arbitrary and capricious.

## COUNT 1

### Violations of the Commerce Clause and the APA

104.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 103.

105.    As it exists as of July 1, 2019, California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, discriminates against interstate commerce and is unconstitutional under the Commerce Clause (U.S. Const. art. I, § 8, cl. 3) of the U.S. Constitution.

106.    Section 706(2)(A) of the APA requires this court to hold unlawful, and set aside, agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Also, Section 706(2)(B) of the APA requires this court to hold unlawful, and set aside, agency action that is "contrary to constitutional right, power, privilege, or immunity."

107.    Accordingly, as of July 1, 2019, California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, must be vacated and set aside.

108.    Also, CMS must be enjoined as of July 1, 2019, from approving any QAF amendment to the California State Medicaid Plan that discriminates against interstate commerce until such time that this Court determines that the amendment's treatment of "border hospitals" does not violate the Commerce Clause.

## COUNT 2

### Violations of the Equal Protection Clause and the APA

109.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 103.

110.    As it exists as of July 1, 2019, California's differential treatment of in-state and out-of-state hospitals under the QAF program, as reflected in the California State Medicaid Plan, bears no rational relationship to any legitimate state purpose and thus violates the Equal Protection Clause of the Fourteenth Amendment (U.S. Const. amend. XIV, § 1).

111.    Section 706(2)(A) of the APA requires this court to hold unlawful, and set aside, agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Also, Section 706(2)(B) of the APA requires this court to hold unlawful, and set aside, agency action that is "contrary to constitutional right, power, privilege, or immunity."

112.    Accordingly, as of July 1, 2019, California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, must be vacated and set aside.

113.    Also, CMS must be enjoined as of July 1, 2019, from approving any QAF amendment to the California State Medicaid Plan that violates the Equal Protection Clause until such time that this Court determines that the amendment's treatment of "border hospitals" does not violate the Equal Protection Clause.

## COUNT 3

### Violations of the Medicaid Act and the APA

114.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 103.

115.    Under the Medicaid Act, a State Plan must "provide for inclusion, to the extent required by regulations prescribed by the Secretary, of provisions (conforming to such regulations) with respect to the furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom."  42 U.S.C. § 1396a(a)(16).
42 C.F.R. § 431.52 interprets 42 U.S.C. § 1396a(a)(16).  It provides in relevant part that "A State plan must provide that the State will pay for services furnished in another State <u>to the same extent that it would pay for services furnished within its boundaries</u>[.]"  (underlining added).

116.    California does not provide supplemental QAF monies to the plaintiffs "to the same extent" that it provides such funds to in-state hospitals.

117.    Section 706(2)(A) of the APA requires this court to hold unlawful, and set aside, agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Also, Section 706(2)(B) of the APA requires this court to hold unlawful, and set aside, agency action that is "contrary to constitutional right, power, privilege, or immunity."

118.    Accordingly, as of July 1, 2019, California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, must be vacated and set aside.

119.    Also, CMS must be enjoined as of July 1, 2019, from approving any QAF amendment to the California State Medicaid Plan that violates 42 U.S.C. § 1396a(a)(16) or 42 C.F.R. § 431.52 until such time that this Court determines that the amendment does not violate the Medicaid Act.

## COUNT 4

### Declaratory Relief

120.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 104.

121.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57.  An actual and justiciable controversy exists regarding the validity of California's QAF program and whether it violates federal law and provisions of the United States Constitution.

122.    No administrative appeal process or other administrative remedy is available to plaintiffs.

123.    All of plaintiffs' injuries are great, immediate, and irreparable, for which damages are inadequate, and for which plaintiffs have no plain, adequate or speedy relief at law or otherwise.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court enter judgment in their favor, and

1.    Declare as of July 1, 2019, that California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, is unconstitutional under the Commerce Clause of the United States Constitution and must be vacated and set aside pursuant to 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B);

2.    Declare as of July 1, 2019, that California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and must be vacated and set aside pursuant to 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B);

3.    Declare as of July 1, 2019, that California's methodology for making QAF payments, as reflected in the California State Medicaid Plan, violates 42 U.S.C. § 1396a(a)(16)

and 42 C.F.R. § 431.52 and must be vacated and set aside pursuant to 5 U.S.C. § 706(2)(A) and 5 U.S.C. § 706(2)(B);

4.      Preliminarily and permanently enjoin as of July 1, 2019, approval by CMS of the California QAF program, and all federal QAF payments, until such time that this Court determines that the program's treatment of "border hospitals" does not violate the Commerce Clause, the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. § 1396a(a)(16), or 42 C.F.R. § 431.52;

5.      Award plaintiffs their costs and attorney's fees; and,

6.      Order such other and further relief as may be just and proper.


Dated: August 20, 2019                         Respectfully submitted,

                                               By: /s/ Dean L. Johnson
                                                   Dean L. Johnson (D.C. Bar No. WA0008)

                                               **DEAN L. JOHNSON, INC.**
                                               181 Utsalady Road
                                               Camano Island, WA 98282
                                               Telephone: (760) 603-0022
                                               Email: deanl.johnson@gmail.com


                                               By: /s/ Thomas J. Weiss
                                                   Thomas J. Weiss (D.C. Bar No. CA00041)

                                               **LAW OFFICES OF THOMAS J. WEISS**
                                               1925 Century Park East, Suite 2140
                                               Los Angeles, California 90067
                                               Telephone: (310) 788-0710
                                               Facsimile: (310) 788-0735
                                               Email:  tweiss@weisslawla.com

                                               *Attorneys for Plaintiffs*